# In The Matter Of:

*GOOGLE INC., A DELAWARE CORPORATION, v. RICHARD WOLFE, ET AL.,*

---

*CRAIG NEVILL-MANNING*
*September 28, 2006*

---

***CONTAINS CONFIDENTEIAL***
***ATTORNEYS' EYES ONLY***
***LEGALINK MANHATTAN***
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

NEVILL-MANNING, CRAIG - Vol. I

LEGALINK
A MERRILL COMPANY

**EXHIBIT A**

Page 6

CRAIG NEVILL-MANNING

Page 7

CRAIG NEVILL-MANNING

Page 8

CRAIG NEVILL-MANNING

Page 9

CRAIG NEVILL-MANNING

note that he may have responsive information on some of the other topics as well, but I didn't check them all, but the ones you identified, I can confirm other than 55 he was designated.

MR. GIBSON: Okay. Good.

BY MR. GIBSON:

Q. Before we get started, are you aware that earlier in this lawsuit two depositions had been taken, one of Mr. Wolfe, who is the defendant, and one of Rose Hagan, who is in-house counsel at Google?

A. I was aware of Rose Hagan's deposition. I wasn't aware of the other one.

Q. Have you looked at or reviewed either of the transcripts from those proceedings?

A. I have not.

Q. I'm going to ask you a couple of questions about document retention policies, et cetera here, and I'd like to start off by asking you if you would describe in your own words what Google's document retention policy is in general with respect to documents.

A. We don't have a document retention

**EXHIBIT A**

56ebabe5-d930-4110-94e2-8f492ca3e247

Page 10

CRAIG NEVILL-MANNING

policy.

Q. There is no formal policy?

A. That's correct.

Q. So with respect to Google -- sorry -- the Froogle product, any documents that would be relevant to that, product development documents, any document, who keeps those?

A. There's no one person designated to keep those, but people have some of those, that information, on their hard disk on their computer.

Q. Is there an individual at Google who is responsible for any type of document retention at all?

A. No, not to my knowledge.

MR. AL-SALAM: Did you mean about Froogle or just anything?

MR. GIBSON: Any.

MR. AL-SALAM: Is there anything in the whole company?

I object.

Lack of foundation.

Beyond the scope of the 30(b)(6) notice.

Just to be clear, there are people

Page 11

CRAIG NEVILL-MANNING

Page 12

CRAIG NEVILL-MANNING

Page 13

CRAIG NEVILL-MANNING

Page 46

Page 47

Page 48

commercial products at Google.

Q. Do you know the time period that she was the product manager for Froogle?

A. I don't remember exactly when she started on the project. In the order of 12 months ago, and she ceased, obviously, when the project was canceled, which I believe we have in the discovery, but it was on the order of several months ago.

Q. So did she replace Pearl?

A. There was one other product manager -- I'm sorry. There were two other product managers in the intervening time between Pearl and Bindu.

Q. Do you know who those two individuals were?

A. Yes.

Q. Can you tell me the names, please.

A. Raja Shah and Karen Padham.

Q. Do you know if there is a formal written advertising budget for the Froogle mark?

A. Not to my knowledge.

Q. If there was one, would you be the person responsible for it?

Page 49

A. No.

Q. Who would, if you know?

A. I don't know, but like I said, it's small.

Q. I'm sorry?

A. I did find out the extent that it's small, like I said, on the order of a few tens of thousands of dollars per year.

Q. Okay.

What I'm trying to understand is, somebody has been allocated money in a budget to spend on advertising the Froogle product. Is that a true statement or no?

A. I -- I -- I don't --

Q. You don't know?

A. I'm not sure, no.

Q. You don't know who would have responsibility for that budget, if, in fact, there even is one?

A. All I -- all I know is it would be somebody in marketing who deals with that.

Q. Who is the head of the marketing department?

A. You know what, I don't know their

**EXHIBIT A**

Page 50

name. It's -- marketing is not something I deal with on a regular basis and it's not a function that's particularly important at Google.
Q. Why do you say that?
A. Most of our customers or users come via word of mouth rather than as a result of explicit marketing.
Q. Was that the case with the Froogle product?
A. Yes.
Q. Okay.
So I don't want to -- you don't know if there's a formal written advertising budget for Froogle, correct?
A. That's correct.
Q. You don't know who would be responsible for it if there was one?
A. That's correct.
Q. You have no idea, I take it then, how any of the budget for advertising Froogle was developed?
A. No, I don't. I got to the point where it was a negligible -- found out that it was a negligible amount of money and I didn't follow

Page 51

it up.
Q. So you met with -- I'm not going to attempt the name, but a person who informed you as to how much the advertising budget was?
A. I made a phone call.
Q. You met with that person?
A. I made a phone call.
Q. Was that in preparation for today's deposition?
A. It was.
Q. Do you know if there's any reports that confirmed any expenditures on advertising on promoting the Froogle name?
MR. AL-SALAM: Objection. Vague.
A. Not that I'm aware of.
Q. Do you know if there's currently a marketing plan for the Froogle product?
A. I'm reasonably confident that there is not, since we decided not to continue to promote the brand.
Q. Was -- do you know if there was ever a marketing plan for the Froogle product?
A. There was a marketing plan, but it

Page 52

was a very small one.
Q. But what?
A. It was a very simple one.
Q. Were you involved in any way in developing that plan?
A. I was not.
Q. Do you know anything about the marketing plan?
A. From what I've -- only what I've seen in the meetings, and I believe those meetings' presentations are in the discovery.
Q. They're in the discovery?
A. Yes.
Q. What do you mean by that?
A. They're in the GPS notes -- I'm sorry -- the GPS presentation that we raised and that's found in discovery.
Q. Were you present at the marketing meetings when the plan was developed?
MR. AL-SALAM: Assumes facts not in evidence.
But go ahead.
I'm not sure there were market meetings, but you can answer.

Page 53

**EXHIBIT A**

LEGALINK, A MERRILL LEGAL SOLUTIONS
(800) 325-3376 www.Legalink.com

56ebabe5-d930-4110-94e2-8f492ca3e247

Page 54

object to facts not in evidence.
I never heard him say the words "marketing meetings."
MR. GIBSON: Let's ask him then.
Q. Were there ever marking meetings?
A. Not to my knowledge.
Q. You never attended any marketing meeting for the product Froogle?
A. No.
Q. So I take it you have no knowledge of any marketing plan, if, in fact, there even is one, for the Froogle product?
MR. AL-SALAM: Mischaracterizes his testimony.
But you can answer.
A. I'm not aware of any marketing plan, but I don't believe that there's ever been a detailed plan of how to market Froogle.
Q. Do you have -- I may have asked you this earlier. If I did, forgive me. Do you have any responsibility for marketing the Froogle product at Google?
A. No, I do not.
Q. Do you have any responsibility for

Page 55

Page 56

Page 57

That was our paramount concern, and consideration of revenue wasn't significant.
Q. So the general concerns were of how the product would look, what were consumers looking for --
A. Correct.
Q. -- that type of --
A. Correct.
MR. GIBSON: You guys want to take a break?
MR. AL-SALAM: Sure.
(A recess was taken.)
Q. Mr. Nevill-Manning, earlier this morning you mentioned a checklist of departments that needed to be, I guess, appraised of what's going on with the Froogle product as it went through the development stage; is that correct?
A. I think I said there was no formal written-down checklist. I think I said there was something akin to a checklist. Essentially there is a list of departments you normally consult with, but it wasn't a piece of paper that you have to check off.
Q. Do you know or recall whether one of

**EXHIBIT A**

Page 58

the departments that was considered to be important in that checklist process was legal?

A. That's not one I remember in the meetings.

Q. Earlier this morning I also asked if you knew who was in charge of the marketing department --

A. Yeah.

Q. -- at Google, and I think you indicated that you didn't know the person's name?

A. No, I didn't know that.

Q. Do you know any individual -- the name of any individuals in the marketing department at Google and--

A. Yes.

Q. -- if so, can you give them to me, please?

A. The one I remember is Doug Edwards, who is the marketing -- I believe the head of marketing at the time we launched Froogle.

Q. Is he still employed by Google?

A. He's not.

Q. Do you know where he is employed?

A. No, I do not.

Page 59

Q. Do you know anyone else who currently works in the marketing department at Google?

A. Yeah. I know -- I know -- I know one other person who is responsible for designing collateral. He's a page-layout person.

Q. Is there anyone else you know in the marketing department at Google?

A. No. As I said, it doesn't have a high profile at Google.

Q. How many people are in the marketing department at Google? Do you know?

A. That I don't know.

Q. Probably not a lot based on what you said.

A. I believe that to be true.

Q. And I'm sorry. The fellow who does the page layouts --

A. His name is Devin Ivester.

Q. Mr. Nevill-Manning, are you familiar with Mr. Wolfe's product Froogles?

A. Not particularly. I visited it once, but I've not spent more than 30 seconds with the product.

Q. Have you ever been on the Website

Page 60

Page 61

CRAIG NEVILL-MANNING

CRAIG NEVILL-MANNING

CRAIG NEVILL-MANNING

Q. Mr. Nevill-Manning, do you have any responsibility at Google for consumer complaints?

A. No, I do not.

Q. Do you know if there is such a department or activity at Google?

A. There is a -- there is a function for receiving e-mail, unsolicited e-mail that Google gets. In some cases, there are complaints about our service, but since users don't pay for our services in general, those responses are really a courtesy.

Q. So there is some e-mail address that consumers can send in complaint messages to?

A. There is not a e-mail address designated for that purpose, but there are e-mail addresses at Google that people can find.

Q. But if I'm a consumer using your product and I don't like something, how do I get to you? How do I explain that to you?

A. I believe there's a page on the Google.com site with a mechanism for sending e-mail to us.

Q. And do you know who would receive that e-mail?

CRAIG NEVILL-MANNING

A. There is a team that receives those e-mails and replies to them.

Q. Is it a team or a department?

A. It's called -- it's called users' support. Whether it's a team or a department, I'm not sure exactly, you know, where to draw the line.

Q. Do you know who is responsible for the users' support function at Google as it relates to the Froogle product?

A. There's no distinction made. There is no specific team dedicated to questions about Froogle, per se.

Q. Okay.

A. But the manager of the users' support team at Google, I believe, is Denise Griffin.

Q. Other than knowing that Denise Griffin manages the user support area and e-mails can be sent to that area regarding customer complaints, do you have any other knowledge at all as to how Google handles consumer complaints?

A. As a general rule, we try to be helpful, but because services are provided gratis there, you know, it's a fairly light-weight

CRAIG NEVILL-MANNING

process.

Q. Let me help you out a little bit. What I'm looking for is the types of complaints, the number that come in, the number of complaints. Do you have any information on something like that?

A. I don't.

Q. But Denise Griffin is the person, in your opinion, that would be most likely able to answer questions like that?

MR. AL-SALAM: Objection. Vague.

I'm not sure what questions you're referring to.

You can answer.

MR. GIBSON: Let me clarify then before he answers.

Q. I'm talking about how consumer complaints are received by Google, the types of complaints that are received, the number of complaints that are received at Google from consumers?

MR. AL-SALAM: About anything?

MR. GIBSON: About anything.

**EXHIBIT A**

56ebabe5-d930-4110-94e2-8f492ca3e247

Page 74

CRAIG NEVILL-MANNING

A. Yes, I believe she is the best person to answer these questions.

Q. And if we wanted to fine-tune it a little with respect to the Froogle product, would she still be the same person to ask these questions to?

A. I believe so.

Q. Mr. Nevill-Manning, do you have any knowledge about any market surveys or market research that Google has done with respect to the Froogle mark?

A. No, I'm not aware of any surveys that have been done.

Q. Do you -- you're saying you don't know if any surveys were done?

A. I don't know if any surveys have been done. If they were done, I have reasonable confidence I have would have seen them.

Q. But you're not sure whether any survey, market survey, has been done or not? You're just saying if it was done, you are reasonably comfortable you would have seen it --

A. That's correct.

Q. -- at some point in time?

Page 75

CRAIG NEVILL-MANNING

Page 76

CRAIG NEVILL-MANNING

organization reports into.

Q. Who is that?

A. Elliot Schrage.

Q. Do you know what Mr. Schrage's job responsibilities are at Google?

A. They include public relations. I believe they are chiefly public relations, internal communication, and I believe marketing.

Q. Do you know what makes you say "I believe marketing"?

A. Because the organization is somewhat fluid and he started with the company relatively recently and that function previously was associated with public relations, and so I believe it still is, but I haven't seen that written down in black and white.

Q. Now, when I asked you earlier if you knew who the head of the marketing department was, I'm assuming you answered that today.

A. Yes, that's correct.

Q. Did you ever know who the head of the marketing was --

A. Yes.

Q. -- from the time Froogle was

Page 77

CRAIG NEVILL-MANNING

developed to the time it was released?

A. Yes, I did.

Q. Can you give me that person's name?

MR. AL-SALAM: Asked and answered. Go ahead.

A. Douglas Edwards, Doug Edwards.

Q. Other than him, other than Mr. Edwards, was there ever anyone other than Mr. Edwards who was the head of the marketing department during the time period of 2000 through today, that you know of?

A. There was somebody. I don't know their name.

Q. And just to wrap up where we left off with market research, that's not -- surveys, market research, has nothing to do with your job responsibility at Google?

A. That's correct.

Q. Mr. Nevill-Manning, do you have any knowledge or responsibility for licensing either the Google or Froogle marks at Google?

A. I'm sorry. What was the question again?

Q. Do you have any responsibility for

LEGALINK, A MERRILL LEGAL SOLUTIONS
(800) 325-3376 www.Legalink.com

56ebabe5-d930-4110-94e2-8f492ca3e247

Page 86

CRAIG NEVILL-MANNING

Page 87

CRAIG NEVILL-MANNING

Tracy will read it back to you. The question I want to know is: As you sit here today, what evidence do you have to support the allegations made in paragraphs in the complaint?

A. Say that again.

Q. What evidence do you have to support the allegations made in the paragraphs of the complaint? I'll give you the paragraph numbers.

MR. AL-SALAM: I'd just like to object as lack of foundation.

Beyond the scope of the 30(b)(6) notice.

It's calling for a legal conclusion.

MR. GIBSON: You know, what does 47 ask for in the notice?

MR. AL-SALAM: Since the time of these objections, we have agreed to dismiss our complaint. I realize you've not agreed to the formal dismissal. As I told your partner, Mr. Powley, we are going to dismiss it one way or the other. We're just going to have to bring a motion. I did not -- given that, we have

Page 88

CRAIG NEVILL-MANNING

not prepared Mr. Nevill-Manning to testify against the evidence supporting the allegations in our complaint.

In our view, the only remaining allegations in the case are going to be the claims by your clients against Google. The only issue is whether or not our complaint gets dismissed without cost or with cost. We've agreed to dismiss the complaint with prejudice. I told you and I told Rob we are going to bring that motion promptly. For that reason, we did not prepare Mr. Nevill-Manning on that subject.

MR. GIBSON: Well, Ramsey, just so I can have my piece, you've been telling us that for months. It hadn't been done today. You're showing up for the deposition today. Why you wouldn't prepare him or inform us that you haven't prepared him is beyond me. So I'm going to ask my questions. You can object if you like.

MR. AL-SALAM: May I have a

Page 89

CRAIG NEVILL-MANNING

**EXHIBIT A**

56ebabe5-d930-4110-94e2-8f492ca3e247

Page 134

Page 135

Page 136

A. There are no such agreements.

Q. There was something about customer complaints. Is there any file, electronic or otherwise, that collects customer complaints just related to Froogle?

A. No. I believe they're all in the same database, but one could write a program for -- to find all of them.

Q. Are you aware of the ways in which Froogle was marketed?

A. Yes, I'm aware of the ways that Froogle is marketed to the extent it was marketed at all.

Q. And what were they?

A. There was advertising on our own site, on Google.com, and advertising on other Internet sites, like Yahoo.com, and there's been collateral produced for use at trade shows.

MR. AL-SALAM: These are all my questions.

FURTHER EXAMINATION BY MR. GIBSON:

Q. To follow up on the question that Ramsey just asked, are you responsible at all for marketing at Froogle?

Page 137

EXHIBIT A

56ebabe5-d930-4110-94e2-8f492ca3e247

A. She may or may not.

MR. GIBSON: I have no other questions for the witness.

MR. AL-SALAM: Me either.

(Time noted: 3:13 p.m.)

__________________________
CRAIG NEVILL-MANNING

Subscribed and sworn to before me
This _____ day of _________, 2006.

__________________________________

STATE OF NEW YORK )
ss:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE ____ ____
CHANGE FROM: ____________________
CHANGE TO:____________________
REASON: __________________________________

____ ____
CHANGE FROM:____________________
CHANGE TO:____________________
REASON: __________________________________

____ ____
CHANGE FROM:____________________
CHANGE TO:____________________
REASON: __________________________________

____ ____
CHANGE FROM:____________________
CHANGE TO:____________________
REASON: __________________________________

____ ____
CHANGE FROM:____________________
CHANGE TO:____________________
REASON: __________________________________

____ ____
CHANGE FROM:____________________
CHANGE TO:____________________
REASON: __________________________________

____________________
CRAIG NEVILL-MANNING

Subscribed and sworn to before me
this _____ day of _________, 2006.
________________________________

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF QUEENS )

I, TRACY ECKHOFF, a Shorthand Reporter and Notary Public for the State of New York, do hereby certify:

That CRAIG NEVILL-MANNING, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of _______________, 2006.

________________________
TRACY ECKHOFF

I N D E X

| EXAMINATION BY: | | PAGE |
|---|---|---|
| Craig Nevill-Manning | Mr. Gibson | 4 |
| | Mr. Al-Salam | 135 |
| | Mr. Gibson | 136 |

EXHIBITS
DESCRIPTION

| | PAGE |
|---|---|
| (Defendant's Exhibit 18 for identification, P 019663 through P 019683.) | 120 |
| (Defendant's Exhibit 18 for identification, P 020163 through P 020186.) | 127 |

56ebabe5-d930-4110-94e2-8f492ca3e247